RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

OMARI MAZERA,
　　　　　*Plaintiff-Appellant/Cross-Appellee,*

　　　*v.*

VARSITY FORD MANAGEMENT SERVICES,
LLC et al.,
　　　　　*Defendants-Appellees/Cross-Appellants.*

Nos. 08-1453/1515

>

—————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-12970—Avern Cohn, District Judge.

Argued: April 27, 2009

Decided and Filed: May 19, 2009

Before: GUY, GILMAN, and COOK, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Joseph H. Spiegel, JOSEPH H. SPIEGEL, P.C., Ann Arbor, Michigan, for
Appellant. Ernest Raymond Bazzana, PLUNKETT COONEY, Detroit, Michigan, for
Appellees. **ON BRIEF:** Joseph H. Spiegel, JOSEPH H. SPIEGEL, P.C., Ann Arbor,
Michigan, for Appellant. Ernest Raymond Bazzana, PLUNKETT COONEY, Detroit,
Michigan, for Appellees.

—————————————

**OPINION**

—————————————

　　　RONALD LEE GILMAN, Circuit Judge. Omari Mazera was fired from his job as
a car porter at Varsity Ford Services, LLC. After filing a lawsuit against his former
employer on the basis of race and disability discrimination, he moved the district court to
declare that his prior written agreement to arbitrate this type of dispute was not enforceable.
The district court denied the motion, holding that the arbitration agreement was binding on

Mazera.  But the court severed a cost-splitting provision in the agreement that required Mazera to pay up to $500 of the arbitration costs, holding that the provision would likely deter employees such as Mazera from enforcing their rights.  For the reasons set forth below, we **AFFIRM** the judgment of the district court insofar as it held that Mazera entered a binding agreement to arbitrate, but **REVERSE** the judgment regarding the severance of the cost-splitting provision and **REMAND** that issue for further proceedings consistent with this opinion.

## I.  BACKGROUND

Mazera is a naturalized United States citizen who was born in Kenya.  He began working as a porter for Varsity Ford in Ann Arbor, Michigan in April 1999.  In August 2006, Mazera was fired.  He filed suit in the district court 11 months later, alleging that Varsity Ford had violated both federal and state law by terminating his employment due to his race and disability.  Varsity Ford set forth various affirmative defenses to the complaint, including an assertion that the lawsuit was barred by a prior agreement to submit all such disputes to binding arbitration.  Mazera later moved for a declaratory judgment that would free him from the arbitration agreement.  Varsity Ford opposed the motion and submitted documents evidencing a binding agreement to arbitrate.

Upon being hired, Mazera received an employee handbook.  The opening page of the handbook stated:

> NOTHING CONTAINED IN THIS HANDBOOK IS INTENDED TO CREATE (NOR SHALL BE CONSTRUED AS CREATING) A CONTRACT OF EMPLOYMENT (EXPRESS OR IMPLIED) OR GUARANTEE  EMPLOYMENT FOR ANY TERM OR FOR ANY SPECIFIC PROCEDURES.   THERE IS NO CONTRACT OF EMPLOYMENT BETWEEN VARSITY FORD AND ANY ONE OR ALL OF ITS EMPLOYEES.   EMPLOYMENT SECURITY CANNOT BE GUARANTEED FOR OR BY ANY EMPLOYEE.

In the foreword to the handbook, Varsity Ford "reserve[d] full discretion to add to, modify, or delete provisions of [the] handbook at any time without advance notice."  The original handbook did not contain an arbitration clause.

In April 2004, the handbook was revised to contain a four-step Mandatory Complaint Procedure that required employee complaints, including complaints of discrimination, to be

resolved via a four-step process that culminated in arbitration proceedings. That October, Varsity Ford revised the handbook once again, setting forth additional details about costs, selection of an arbitrator, powers of the arbitrator, and enforcement of an arbitration award. These revisions included the following provisions regarding cost splitting:

> [W]ithin this time period [ten days from the date of an unfavorable decision by the president of the dealership] you [the employee] must deposit with the General Manager $500.00 or five (5) days pay, whichever is less. If you request a waiver of the deposit fee, you must state the reasons for your request and submit the request to the General Manager. This request must be submitted within the ten (10) business day limit. If the request is denied, you will have ten (10) additional days after notice of denial to pay the deposit fee in order to perfect your appeal. The Dealership retains the right to waive or reduce the deposit fee at its sole discretion. The deposit fee shall be refunded to you if you prevail in full before the Arbitrator.
>
> . . .
>
> The Arbitrator's fee and expenses shall be borne fully by the Dealership if the award is fully in your favor with the deposit for arbitration to be refunded to you. The Arbitrator's fee and expenses shall be shared equally by both parties if all or part of the Arbitration decision is in favor of the Dealership, but your costs for the arbitration fee shall not exceed $500.00 or five days pay, whichever is less, with the remainder of the expenses to be paid by the Dealership.
>
> In addition, the opening page of the handbook was revised to read:
>
> NOTHING CONTAINED IN THIS HANDBOOK IS INTENDED TO CREATE (NOR SHALL BE CONSTRUED AS CREATING) A CONTRACT OF EMPLOYMENT (EXPRESS OR IMPLIED) OR GUARANTEE EMPLOYMENT FOR ANY TERM OR FOR ANY SPECIFIC PROCEDURES. . . . **THE ONLY EXCEPTION IS THE MANDATORY COMPLAINT PROCEDURE WHICH IS A BINDING OBLIGATION FOR BOTH EMPLOYEES AND THE DEALERSHIP.**

(Emphasis added.) On October 29, 2004, Mazera signed a document that stated: "I acknowledge receipt of the Mandatory Complaint Procedure and understand that compliance with this Procedure is a term and condition of employment."

The district court denied Mazera's motion to declare the arbitration agreement unenforceable. According to the court, Mazera's lawsuit was precluded by a valid and enforceable agreement to submit the dispute to arbitration. The cost-splitting provision that mandates the deposit by Mazera of up to $500, however, was declared to be "prohibitively

expensive" and "unreasonable." According to the court, "a substantial number of similarly situated persons would be deterred" by the deposit "from seeking to vindicate their federal statutory rights[,]" causing the court to sever the cost-splitting provision from the agreement. The court then ordered arbitration and dismissed the case.

Mazera appealed, arguing that the district court should have let a jury decide whether a valid agreement to arbitrate had been formed. Varsity Ford filed a cross-appeal regarding the severance of the cost-splitting provision. The district court stayed the arbitration proceedings pending this appeal.

## II. ANALYSIS

### A.    Standard of review

We apply the de novo standard of review to a district court's decision to compel arbitration. *Landis v. Pinnacle Eye Care, LLC*, 537 F.3d 559, 561 (6th Cir. 2008). The court "must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement." *Id.*

### B.    Validity of the Varsity Ford arbitration agreement

"By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). Mandatory arbitration agreements in the employment context are governed by the Federal Arbitration Act, which evidences a strong policy preference in favor of arbitration. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001).

Mazera argues that § 4 of the Act entitles him to a jury trial regarding the validity of the Varsity Ford arbitration agreement. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof."). But "[i]n order to show that the validity of the agreement is 'in issue' [under 9 U.S.C. § 4], the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). If

"a reasonable finder of fact could conclude that no valid agreement to arbitrate exists," the issue is subject to resolution by a jury. *Id.*

The Third Circuit has opined that "[a]n unequivocal denial that the agreement had been made, accompanied by supporting affidavits . . .[,] in most cases should be sufficient to require a jury determination on whether there had in fact been a meeting of the minds" about arbitration. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 55 (3d Cir. 1980) (internal quotation marks omitted). In reliance on that language, Mazera submitted an affidavit accompanying his motion for a declaratory judgment. He did not deny having entered into an arbitration agreement, but instead claimed that he had "received no consideration as to any arbitration agreement," "had little to no bargaining power" concerning its terms, "had no attorney[,] and did not understand English as well as other employees." Mazera's affidavit further contended that he "was not told he was waiving his right to a jury trial," "is not a sophisticated business person," and that he did not understand the difference between a jury trial and arbitration. Finally, Mazera insisted that "[a]rbitration was not a condition of his employment, but instead was slipped in as a unilateral decision" by Varsity Ford. He relies on *Par-Knit Mills* in arguing that these statements created a genuine issue of material fact that requires submission to a jury. *See id.*

Although Mazera's affidavit raises several factual issues—his lack of bargaining power, the absence of an attorney, language problems, and his degree of understanding of the contract—none of these statements is material with respect to the validity of the arbitration agreement. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) ("[I]nequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."); *Par-Knit Mills*, 636 F.2d at 55 ("A naked assertion . . . by a party to a contract that it did not intend to be bound by the terms thereof is insufficient to place in issue 'the making of the arbitration agreement' for the purposes of Section 4 of the Federal Arbitration Act."); *Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.*, 195 N.W.2d 865, 869 (Mich. 1972) ("[I]n the case of one who signs without reading, [i]t [is] his duty to examine[] the contract, [and] to know what he signed . . . ." (internal quotation marks omitted)).

*Par-Knit Mills* provides a good example of the sort of material factual dispute that warrants a jury trial under 9 U.S.C. § 4. In that case, the Third Circuit ordered a jury trial to be held on the issue of whether a production manager who signed documents acknowledging the receipt of textiles at the mill had the authority to form a binding arbitration agreement that was contained in the fine print of the documents. *Par-Knit Mills*, 636 F.2d at 55. This case has no comparable *material* fact in dispute.

Mazera's other arguments for a jury trial on arbitrability—the lack of consideration and the contention that the arbitration agreement was not a condition of his employment—are legal matters of contract interpretation that are not amenable to a jury trial. With respect to consideration, the district court correctly noted that "the Mandatory Complaint Procedure is a contractual obligation of both the employee and Varsity Ford." Mazera has not briefed this issue on appeal, but simply states that he "received no consideration." But the Mandatory Complaint Procedure contains reciprocal obligations for both parties and is therefore a valid contract. *See Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 974 (6th Cir. 2007) (holding that, under Tennessee law, adequate consideration existed to support an arbitration agreement because "the arbitration process was binding on both employer and employee"); *Rembert v. Ryan's Family Steak Houses, Inc.*, 596 N.W.2d 208, 210 (Mich. Ct. App. 1999) ("We . . . hold that as long as no rights or remedies accorded by the statute are waived, and as long as the procedure is fair, employers may contract with their employees to arbitrate statutory civil rights claims.").

Mazera's argument that arbitration was not a condition of his employment similarly lacks merit. The document that Mazera signed on October 29, 2004 plainly states that the Mandatory Complaint Procedure "is a term and condition of employment." That Procedure also requires that "both parties waive all rights to a civil suit" in favor of binding arbitration. The district court therefore did not err in concluding that the arbitration of claims became a condition of Mazera's employment.

## C.     Cost-splitting provision

We now turn to Varsity Ford's cross-appeal regarding the enforceability of the cost-splitting provision in the arbitration agreement. This court set forth the standard for judging the validity of cost-splitting provisions in arbitration agreements in *Morrison v. Circuit City*

*Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003) (en banc). The analysis requires a case-by-case inquiry into whether "the potential costs of arbitration are great enough to deter [potential litigants] and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum." *Id.* at 663. Reviewing courts must "define the class of . . . similarly situated potential litigants by job description and socioeconomic background," and "look to average or typical arbitration costs" weighed against "the potential costs of litigation." *Id.* at 663-64.

Courts should keep in mind that "many litigants will face minimal costs in the judicial forum, as the attorney will cover most of the fees of litigation . . . ." *Id.* at 664. In short, where "the overall cost of arbitration, from the perspective of the potential litigant, is greater than the cost of litigation in court," and the "additional expense . . . would deter potential litigants from bringing their statutory claims in the arbitral forum," the cost-splitting provision is unenforceable. *Id.* (citation and internal quotation marks omitted).

Before losing his job, Mazera earned $10 per hour in wages. He also received an unspecified amount in commissions when he identified missing parts or damage on the vehicles that were delivered to Varsity Ford. Assuming that Mazera worked 50 weeks per year and 40 hours per week, his gross income was thus $20,000 per year plus some additional amount in commissions.

The Varsity Ford arbitration agreement requires Mazera to deposit the lesser of $500 or five days' pay for arbitration costs at the outset—*i.e.*, within ten days of an unfavorable decision by the president of the dealership—in order to pursue his rights. Five days' pay at $10 per hour is $400 (8 hours/day x 5 days x $10/hour) and, after Mazera's commissions are added, the deposit requirement would likely fall somewhere between a minimum of $400 and the $500 cap. The district court did not discuss the range of the required deposit, but simply analyzed the cost-splitting provision under the assumption that Mazera would have to deposit $500—the highest possible amount. Because our evaluation of the provision's validity would not change regardless of the precise amount within this range that Mazera is required to deposit, we will make the same assumption.

In *Morrison*, this court declined to enforce a provision that required an employee to contribute up to 3% of her pay for arbitration costs within 90 days of the arbitration award.

Morrison had earned $54,060 per year before losing her job, so the 3% equaled $1,622. The court recognized that this provision "present[ed] a close[] issue," but invalidated the provision because the need to "risk[] one's scarce resources in the hopes of an uncertain benefit" was likely to deter a substantial number of litigants. *Id.* at 669-70. In addition, the court emphasized the fact that a "[r]ecently terminated" employee "must continue to pay for housing, utilities, transportation, food, and the other necessities of life in contemporary society despite losing her primary, and mostly likely only, source of income." *Id.* at 669.

Mazera's case, like that of the *Morrison* plaintiff, is a close one. The potential cost of arbitration to Mazera is only 31% of the amount invalidated in *Morrison*, but Mazera's income is proportionally lower as well, amounting to roughly 37% of the *Morrison* plaintiff. Moreover, the en banc court in *Morrison* stressed the short time line for the plaintiffs to pay their share of costs—90 days from the date of an arbitration award. *Id.* at 669. Here, the time line is much shorter. Mazera must make his deposit within just 10 days after an unfavorable decision by the dealership's president, the point at which he would learn that arbitration was necessary in order to pursue his rights.

We therefore agree with the district court that, although some plaintiffs with modest incomes comparable to Mazera's might manage to come up with $500 and "be determined to pursue [their] claims[] regardless of costs," *id.* at 663, a substantial number of others would find the amount prohibitively expensive. The early deadline to make the deposit further increases the onerousness of the provision. Many potential plaintiffs who would otherwise pursue their federal statutory rights in court via a contingency-fee arrangement (where their attorney would likely advance the $350 filing fee) might decline to do so in light of Varsity Ford's requirement that they deposit $500 within 10 days of an unfavorable decision on their grievance by the dealership's president.

We do not mean to suggest by the above analysis that *any* cost-splitting provision is unenforceable where the plaintiff in question earns wages in the neighborhood of $20,000 per year. But *Morrison* demands a case-by-case inquiry that protects "the important goals of federal anti-discrimination statutes." *Id.* at 653. Here, because the time line for payment in the Varsity Ford arbitration agreement is short and the fee sizeable when viewed from the

perspective of a recently fired low-wage earner, we agree that the $500 deposit amount is too much to demand of Mazera.

But Varsity Ford argues on appeal that even if the $500 deposit requirement is unenforceable as to Mazera, the provision that permits him to request a waiver of the deposit saves the agreement. Mazera makes no mention of the waiver provision in his brief, and the district court summarily dismissed the possible effect of the provision in its *Morrison* analysis, commenting only that "the fact that Varsity Ford has the sole authority to determine whether the $500 will be waived raises a question as to the genuineness of the waiver provision."

This court made clear in *Morrison*, however, that "[w]here . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 659 (quoting *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000)). If Varsity Ford waives or sufficiently reduces the deposit amount for those employees who are likely to be deterred from pursuing their rights because they are unable to pay it, the provision would not run afoul of *Morrison*'s prohibition. See *Morrison*, 317 F.3d at 664.

Contrary to the district court's statement impugning the genuineness of the waiver provision, we suspect that Varsity Ford would seriously entertain Mazera's waiver request. Varsity Ford's counsel stated at oral argument that, although he could not predict with certainty how his client would respond to a waiver request, he thought it likely that such a request would be granted. This prediction aligns with a similar observation by this court in *Morrison* that "the cost-savings of the arbitral forum to employers exist regardless of whether cost-splitting provisions are enforced." *Id.* at 665 n.10.

In light of the waiver provision, we remand the case to the district court for entry of "an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof." 9 U.S.C. § 4. The arbitration agreement requires Mazera, if he desires to do so, to "request a waiver of the deposit fee" "within ten (10) business days after receipt of the [unfavorable decision by the dealership's president]." In other words, the ten-day limit under the four-step Mandatory Complaint Procedure begins to run when internal

attempts to resolve the complaint have failed, and arbitration proceedings are the final remaining option.

But rather than initiating the process within Varsity Ford under the first three steps of the Mandatory Complaint Procedure, Mazera challenged the enforceability of the agreement in court. Mazera must therefore request a waiver of the deposit requirement within 10 days of the district court's order following this remand if he desires to pursue arbitration without having to comply with the cost-splitting provision. We note, however, that whether the 10 days act as a statute of limitations and, if so, whether such a short contractual limitations period is enforceable, are issues that we need not decide at this stage of the proceedings. *See, e.g.*, *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357 (6th Cir. 2004) (holding that a six-month statute of limitations in an employment contract is reasonable); *Timko v. Oakwood Custom Coating, Inc.*, 625 N.W.2d 101, 106 (Mich. Ct. App. 2001) (describing the enforceability requirements for abbreviated statutes of limitations in Michigan employment contracts).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court insofar as it held that Mazera entered a binding agreement to arbitrate, but **REVERSE** the judgment regarding the severance of the cost-splitting provision and **REMAND** that issue for further proceedings consistent with this opinion.